[Civ. No. 21016. Second Dist., Div. Three. Apr. 16, 1956.]

JOAN NESJE et al., Appellants, v. METROPOLITAN
COACH LINES (a Corporation) et al., Respondents.

Albert D. White and Eric A. Rose for Appellants.

John R. Allport and John T. LaFollette for Respondents.

SHINN, P. J.—Plaintiffs in this action are the surviving spouse, adult sister and two adult brothers of Crist Nesje, deceased, who sue for damages resulting from the wrongful death of decedent which occurred while he was crossing a street in Long Beach and came into contact with a single car electric interurban train of Metropolitan Coach Lines operated by its motorman, Louis C. Schull, who also was named as a defendant. Verdict and judgment were in favor of the defendants and plaintiffs appeal.

Ocean Boulevard extends easterly and westerly and Chestnut Street northerly and southerly in the city of Long Beach. Metropolitan, to be referred to as defendant, maintains double railway tracks on Ocean Avenue. Decedent was crossing in a crosswalk from the southeasterly to the northeasterly corner of the intersection of the two streets; defendant's train was approaching from the east on the northerly track. Schull observed decedent as he entered the street. The train was then about 100 feet from the intersection. He also noticed that as decedent approached the tracks he was not looking toward the train. Schull sounded his bell vigorously and proceeded at 15 miles per hour until he was about 20 feet from the intersection when decedent was at the south rail of the southerly track. At that time decedent ran in front of the train; Schull immediately applied the emergency brakes but decedent failed to get past the train and was struck by the right front step, receiving injuries from which he died. The train came to rest in the west crosswalk, having traveled about 80 feet from the point where brakes were applied.

The first point to be considered is that the court refused plaintiffs' requested instruction on the doctrine of last clear chance. We think there was no error in this ruling.

The uncontradicted evidence was that at a speed of 15 miles per hour the train could be stopped with use of the emergency brakes in from 75 to 100 feet. We think the only reasonable conclusion from the facts in evidence was that Schull gave ample warning by ringing the bell and that he applied the brakes as soon as he realized, or should have

realized, that decedent was in a position of danger from which, due to his inattention, he probably would not escape through his own efforts.

Decedent was in a position of safety until he started to run, as one of plaintiffs' witnesses described it, with about six foot strides. Schull had had a long experience in the operations of trains. He had the knowledge, common to the general public, that pedestrians, walking toward railway tracks, make use of their senses, look for danger before stepping onto a railway track, hear a warning bell when it is vigorously rung and come to a stop to let the train go by if common sense requires them to do so for their own safety. Although Schull observed that decedent was not looking toward the train he had no duty to anticipate that he would not look before going onto the north track or not hear the ringing of the bell while he was still in the place of safety, nor did he have a duty to anticipate that when decedent did hear the bell he would run in front of the train instead of coming to a stop. There was no evidence that decedent, when first seen, was hurrying across the street; he had ample opportunity to stop in a safe place. Schull, in order to stop his train before it came to the crosswalk, would have had to apply the brakes almost immediately when he first saw decedent starting to cross the street. It is not required that trains be operated in that manner. They do not have to give way to every pedestrian who may possibly walk or run in front of them in spite of the ringing of a bell in such manner and at such time as to give effective warning of the train's approach. ▮ Operators of trains are not bound to anticipate that such warnings will either not be heard or will be ignored. It may be that if Schull had immediately applied his brakes when he first observed decedent he could have stopped the train before it reached the crosswalk, but this is not to say that he had a duty to do so. He was only required to use ordinary care to avoid an accident, and in deciding what course to pursue he had no duty to anticipate that decedent would disregard the warning and would impulsively run in front of the train. A mere possible opportunity to avoid an accident is not a last clear chance to avoid it. The only chance Schull had was through the exercise of the highest degree of care and the taking of extraordinary precautions. When the train was a sufficient distance away to be stopped before it reached the crosswalk decedent was in

no danger, nor did he appear to be in danger. The instant it appeared he was not going to stop Schull did all that could be done to avoid an accident, but it was too late. Upon the undisputed facts of the case it would have been error to give an instruction on the doctrine of last clear chance. (See *Doran* v. *City & County of San Francisco*, 44 Cal.2d 477 [283 P.2d 1]; *Rodabaugh* v. *Tekus*, 39 Cal.2d 290 [246 P.2d 663]; *Behne* v. *Pacific Elec. Ry. Co.*, 30 Cal.App.2d 437 [86 P.2d 843]; *Poncino* v. *Reid-Murdock & Co.*, 136 Cal.App. 223 [28 P.2d 932]; *Dalley* v. *Williams*, 73 Cal.App.2d 427, 435 [166 P.2d 595].)

 The next point which we deem worthy of discussion is that the court erred in receiving the testimony of one Thompson that he analyzed blood which had been brought to him for that purpose and found that it contained .311 per cent by weight of alcohol. The testimony was received notwithstanding the absence of competent evidence that it was the blood of Nesje that was analyzed. Plaintiffs made repeated objections, which were overruled, the ground of the objections being that no foundation had been laid for the testimony of the chemist for the reason that the specimen was not shown to be the blood of Nesje. The objections were well taken. The proof of identity was manifestly insufficient. Thompson testified from a label on a bottle which contained the sample of blood which he analyzed. On the label was a notation that the blood was taken by F. B. McDonald, the place not being specified; also that the sample was picked up by a Dr. Dickey who gave it to one Phil Atkins and that it was delivered to the laboratory. It was further noted "Body identified by personal papers." Thompson testified that McDonald was an embalmer at Loper Funeral Service in Los Angeles County. This was the extent of the foundation laid for the testimony. There was no testimony as to who wrote the label, whether one person or several, or how the writer or writers came by the information which was entered on the label. Although it was stated "Body identified by personal papers" there was nothing to show who made the identification and nothing to show under what circumstances the sample of blood was taken. All the entries on the label were pure hearsay. It was not shown that McDonald who purportedly took the specimen even wrote an entry to that effect. Defendant says that this was an official record of the coroner's office kept in due course of business and admissible

as such. (Code Civ. Proc., § 1953f.)[1] The evidence in question did not even purport to come within this section. As a memorandum kept in the coroner's office to identify the persons responsible for bringing the sample into the office the label would have served a useful purpose. It would have facilitated the location of witnesses who could testify respecting the notations of facts on the label. But the label on the bottle was not an official record of the coroner nor was it shown to have been made under his authority or in his office. It was not evidence of any of the facts noted thereon. It might have been written in its entirety by someone who had no knowledge of the facts and no reliable source of information. It did not rise to the dignity of evidence that it was the blood of the decedent that was analyzed. The error of admitting the testimony of Thompson would require a reversal if a judgment in favor of plaintiffs could be sustained.

Decedent was guilty of contributory negligence up to the instant of the occurrence of the accident. This is necessarily conceded by plaintiffs in contending that the doctrine of last clear chance applied. We have stated our reasons for holding that it did not apply and it follows that the evidence failed to establish any basis of liability of the defendant.

Plaintiffs also assign error in instructions given at the request of defendant and in refusing an instruction requested by plaintiffs as to the duties of the decedent and the defendant toward each other. It is unnecessary to consider these points for, as we have stated, if the last clear chance doctrine was inapplicable a verdict against defendants would have been unwarranted.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied May 16, 1956, and appellants' petition for a hearing by the Supreme Court was denied June 6, 1956. Carter, J., was of the opinion that the petition should be granted.

---

[1] "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. [Added by Stats. 1941, ch. 482, § 1.]"