[Civ. No. 34697. Second Dist., Div. One. Aug. 14, 1970.]

SHIRLEY M. ROMERO, as Administratrix, etc.,
Plaintiff and Respondent, v.
VOLUNTEER STATE LIFE INSURANCE COMPANY,
Defendant and Appellant.

## Counsel

Schramm, Raddue & Seed and John W. Warnock for Defendant and Appellant.

Harris, Parke, Barnes & McEwen and Thomas R. Hudson for Plaintiff and Respondent.

## Opinion

**LILLIE, J.**—Plaintiff's intestate, Andres Romero, met his death in the early morning hours of June 28, 1966, while driving his Thunderbird automobile along U.S. 101 in the City of Santa Barbara. This suit for breach of contract was instituted when defendant company refused to pay the proceeds of a $10,000 accidental death life insurance policy issued to the beneficiary thereof (T. J. Bettes Company of California) which, in turn, assigned its interest to decedent's estate. Asserted as a defense by the issuing company were the following provisions in the policy sued on: "This policy does not cover any loss that shall have occurred either directly or indirectly as a result of: (1) self-destruction or any attempt thereat while sane or insane, or of injuries intentionally inflicted by the insured on himself . . . (6) injuries contracted or sustained by the Insured while committing or attempting to commit an assault or felony . . . ." In a jury trial a verdict was returned in plaintiff's favor; the instant appeal is from the judgment entered on that verdict after the denial of defendant's motion for a new trial.

Two assignments of error are urged: first, the court erroneously refused defendant's offered instruction on the effect of the felony-drunk-driving statute to the felony exception referred to in (6), *supra,* and further erred by giving its own instruction on the same subject matter; and second, it was error to receive in evidence decedent's death certificate since it was not prepared as required by law.

The decedent apparently was alone when the fatal injuries were sustained since no person was found who either witnessed the accident or came upon the scene immediately thereafter. Certain physical facts, however, established the following: At the time in question decedent's car was northbound near the State Street overpass between 2:15 and 2:35 a.m. It did not follow the sweeping curve to the left at that location but continued on in a straight line for approximately 63 feet, leaving the main portion of the highway and crashing into a concrete pillar, positioned several feet from the right edge of the roadway's right shoulder, supporting the overpass. There were no skid marks along the length of the vehicle's trajectory. The vehicle struck the pillar with such force that it ripped apart, wreckage coming to rest across both the northbound lanes. Medical evidence established, and it is not disputed, that death ensued within 60 seconds following the collision of car and concrete, due to extreme internal injuries including the severing of the aorta. While the maximum speed limit at the point of the accident was 65 miles per hour, there was varying testimony by certain Highway Patrol officers as to the estimated speed of the vehicle at the moment of collision—from a speed in excess of 80 miles per hour to less than 55 miles per hour, both estimates being based on the physical facts observed.

At 2:30 o'clock, the same morning, Lewis Jones left his home by car to report for work at his place of employment, being assigned to the 3 a.m. to 11 a.m. shift. Driving in the northbound left lane, he collided with the wreckage of decedent's car which, according to his testimony, he was unable to avoid because there was a large truck in the right lane immediately next to him. Minor injuries requiring medical attention were sustained by Mr. Jones whose car was also damaged.

The body of the deceased was removed to the Haider Mortuary. An embalmer, there employed, first testified that he removed a sample of blood from the body which eventually found its way into a glass vial bearing the inscription "Andres Romero." On cross-examination, however, he stated that he could not recall whether he took any blood sample from the body, that there existed no mortuary record of such taking and that he did not know who placed the name "Andres Romero" on the bottle; he insisted, nevertheless, that customary procedure was followed.

At approximately 2:30 p.m. the coroner's pathologist, Dr. Blanchard, arrived at the mortuary and performed an autopsy. Two hours later he left with the bottle bearing the inscription "Andres Romero" and subsequently conducted an alcohol blood test of its contents; that test resulted in a finding that the alcohol content of the sample was .228 milligrams by weight per 100 cubic centimeters of blood, considerably above the level at which all persons are deemed to be under the influence of alcohol.

The instruction proposed by defendant, the refusal of which it claims constitutes reversible error, read as follows: "If you find that ANDRES ROMERO, while under the influence of intoxicating liquor, drove a motor vehicle and while so driving, did any act forbidden by law or neglected any duty imposed by law, which act or neglect proximately caused bodily injuries to Mr. Lewis Jones, then you must find in favor of the defendant and against plaintiff." Instead, and according to appellant compounding the above error, the court of its own motion gave this instruction: "To come within the felony exception, the injuries and death of Andres Romero must be related to or a proximate result of a felony then being committed by him, and if you find in this case that Lewis Jones' injury followed the injuries and death of Andres Romero, the necessary element of injury to another is lacking and Andres Romero at that instant was not, and could not have been in the act of committing a felony."

■ There are three elements inherent in the felony drunk driving offense: (1) driving on a highway while intoxicated; (2) doing any act forbidden by law; and (3) proximately causing bodily harm to another person. (Veh. Code, § 23101; *People* v. *Smylie*, 217 Cal.App.2d 118, 120 [31 Cal.Rptr. 360].) That being so, there must be proof of the concurrence of all such elements before the offense can properly be said to have been committed. While the presence of (2) is not wholly irrelevant to the issues at bar, the parties argue the existence, or otherwise, of elements (1) and (3) as applied to the instructions constituting the first assignment of error.
■ As to (1), in our view there is no merit to plaintiff's contention that no foundation was laid for the admission into evidence of the alcohol test analysis. Although there was no positive proof that the blood sample was taken from the remains of the deceased, plaintiff's citation of *Nesje* v. *Metropolitan Coach Lines*, 140 Cal.App.2d 807, 810 [295 P.2d 979], is not helpful in light of the fact that there repeated objections, all overruled, were interposed to the competency of the evidence that the blood analyzed was that of the plaintiffs' intestate; here, however, by questions put by her counsel to the pathologist, plaintiff conceded that the blood sample was

that of her deceased husband.[1] The *Nesje* case was subsequently distinguished in *Wagner* v. *Osborn*, 225 Cal.App.2d 36, 42, (fn. 1) [37 Cal.Rptr. 27]. After first pointing out that the question of tampering or alteration was one of weight for the trier of fact, the court continued: "Objections on the foundation of the expert's opinion interposed after evidence of the blood sample was already in the record not only came too late, but failed to specify the particular defect now urged. The objections insofar as admissibility of the evidence is concerned must be held to have been waived." (P. 44.) There can be no question that element (1) of the applicable statute was properly included in the instructions—that offered by defendant and that given by the court on its own motion.

We take up the applicability of element (3), relating to proximate causation, to such instructions. Defendant justifies the instruction in the form proposed by it upon certain determinations made in *Barker* v. *California-Western States Life Ins. Co.,* 252 Cal.App.2d 768 [61 Cal.Rptr. 595] (hearing denied by Supreme Court). The exclusion clause there was not dissimilar to the one at bar: " '*Commission of a Felony:* The company shall not be liable for any loss to which a contributing cause was the insured's commission or attempt to commit a felony.' " (P. 770.) Appellant's husband, Lester A. Barker, was killed during the early morning hours of the day in question while driving his car under the influence of liquor on the wrong side of a divided highway and colliding head-on with another car whose driver was also killed. While the precise question in this proceeding was not resolved in *Barker*, other determinations and statements found in that case are urged by defendant to be dispositive here. The trial court having found for defendant insurer on the ground that its insured had died during the commission of a felony (Veh. Code, § 23101), such judgment was affirmed on appeal. In so holding the court held that the conduct proscribed by the above statute came within the meaning of the felony exception in the insurance contract: ". . . there is no ambiguity in this clause, and we conclude that a reasonable person of average intelligence, seeking insurance of the nature provided in the policy, who read the clause would have understood it to mean that the insurance carrier was relieved of liability if the conduct contributing to the insured's death was deemed felonious under the laws of this state." (P. 774.) The court also held that it was not necessary that the insured suffer a conviction of the felony since the contract in suit concerned a certain type of conduct by the insured, not his criminal liability. In sum, therefore, it was concluded on appeal that sufficient evidence existed to support the finding below that decedent

---

[1]"Q. Dr. Blanchard, would the blood alcohol concentration found in the blood sample of Andres Romero appreciably affect his ability to operate an automobile? A. Yes, it would."

Barker had committed a felony prior to his death and that such felony was a contributing cause of the fatal injuries by him sustained.

The difference between *Barker* and the case at bar is immediately suggested by the sum holding just mentioned. Thus, decedent Romero was dead before element (3) of the statute, injury to Jones, ever occurred, whereas decedent Barker and the driver of the other car presumably died simultaneously during the actual occurrence of element (3). Indeed, it is stated in *Barker* (although with reference to the non-necessity of a subsequent felony conviction) that "the exclusion clause relates primarily to a death benefit and obviously contemplates the death of the insured while he is engaged in the act of committing or attempting to commit a felony, or *shortly thereafter*." (Italics added; p. 774.) The language just emphasized, it is quite apparent, has reference to the commission of the felony and not the death of the insured.

On the other hand, while no California decision of persuasive force is cited by plaintiff, she does rely on a Colorado case, *Penn Mut. Life Ins. Co.* v. *Gibson* (1966) 160 Colo. 462 [418 P.2d 50], the holding in which becomes significant because of the striking similarity of the 'Colorado felony-drunk-driving statute to California's Vehicle Code, section 23101. There the insured, while under the influence of alcohol, struck a stationary vehicle from the rear, injured its driver (one Houck), and was himself killed. Double indemnity was sought by the beneficiary of the policy which contained an exclusion clause that the added benefit "shall not be payable if death results directly or indirectly from . . . (4) the commission by the Insured of an assault or felony; . . ." (P. 51.) The court pointed out that on the date of the accident neither the offense of drunk driving nor causing an accident while intoxicated constituted felonious acts adding: "Only when these events caused a *death or injury to another person* did the statute specifically provide that a felony had been committed. [Citing the Colorado statute.]" (P. 51.) It was argued by plaintiff that the injury to Houck had no influence upon the insured's death and, therefore, no causal relationship existed between the death and the felony. The court accepted this argument: "As to the insured, the event which caused his death, was his collision with another automobile which was precipitated by his wrongful (but non-felonious) acts of driving while intoxicated and operating his vehicle in a reckless manner. The fact that Houck was also injured is not what caused [the insured's] death. *A fortiori* the death was not the result of a felony under the statute." (P. 52.) Such reasoning is wholly out of harmony with *Barker,* and accordingly cannot have our approval; nevertheless the Colorado decision assumes importance here because it emphasizes the fact that there must be some causal relationship between the death of the insured and the commission of the felony.

In a lengthy annotation (166 A.L.R. 1118) entitled " 'Violation of law' clause in life or accident policy as requiring causative connection between violation of law by insured and his death or injury," consideration is given to decisions wherein the exclusion clause is worded " 'while he was violating the law' " or " 'while he was engaged in any violation of law.' " (P. 1137.) It is there pointed out that "the extent of causal connection necessary for invoking the 'violation of law' clause is as much in dispute as in the case of the other types of clauses." (P. 1137.) Although in the instant proceeding both sides apparently agree that the felonious acts must be the *proximate* cause of injury to another—specifically, Mr. Jones—the term "proximate cause" has a variety of meanings. With an undoubted awareness of the rule that ambiguous clauses in policies must be construed against the insurer, defendant seemingly contends that the word "while" has but one fixed meaning, citing 45 Words and Phrases (perm. ed., 1940) p. 81, to wit, the whole series of circumstances involved in the transaction. ■ But more recent cases cited in the 1970 supplement to the above numbered volume establish that "while" is a word of time and not of causation, in contrast to the phrase "as the result of." Applying such latter definition of "while" to the facts at bar, time had already ended (and eternity commenced) for Romero before the occurrence of element (3).

■ "The rule of strict construction against the insurer and liberal construction in favor of the insured is particularly applicable where the policy provides for exceptions to or exclusions from the general import of the principal coverage clause. The burden rests on the insurer to phrase such exceptions and exclusions in clear and unmistakable language. [Citations.]" (*Jarrett* v. *Allstate Ins. Co.*, 209 Cal.App.2d 804, 809-810 [26 Cal.Rptr. 231].) ■ Because of the unique circumstances here presented—no case apposite on its facts, strangely enough, has been found—and for reasons already discussed, we think that the trial court properly refused defendant's offered instruction which, in effect, told the jury to find as a matter of law that the exclusion clause barred recovery by plaintiff's administratrix. For the same reasons we also conclude that the court's instruction, given in place of that offered by the defendant, was not improper; such instruction (as noted at the outset) told the jury that there must be a concurrence of all three elements of the drunk driving felony statute while life was still with Romero before he could have committed the felony in question.

■ Defendant's second, and remaining, point asserts that it was prejudicial error to receive in evidence over objection the death certificate which, inter alia, declared that Mr. Romero died as the result of an accident. ■ In this connection it is properly pointed out that plaintiff had the burden of proving accidental death, thereby negativing suicide, which

latter circumstance was likewise within the exclusion clause of the instant policy. (*White* v. *Aetna Life Ins. Co.*, 198 Cal.App.2d 370, 377 [17 Cal.Rptr. 914].) ■ If prepared as required by law, a death certificate comes within the hearsay exception of section 1281, Evidence Code; upon its reception in evidence, it operates as prima facie evidence of the facts stated therein. (Health & Saf. Code, § 10577.)

■ Defendant complains that certain "blocks" or "spaces" were not filled out, thus making the certificate incomplete. For example, while the deputy coroner signed the document in block 22c, he failed to indicate in block 22b whether he held an investigation, autopsy or inquest. However, the face of the certificate shows (a) time and date of death, (b) place of death, (c) cause of death (the injuries being specified), and (d) a statement of how the injuries were sustained. It was further specified that an autopsy was in fact performed and the findings therefrom were also used to explain the cause of death. Although it is expressly provided that a death certificate is not complete and correct absent all the items of information called for or a satisfactory account for their omission (Health & Saf. Code, § 10004), there is no statutory requirement that each block be used. So far as it goes, defendant's objection is one of form rather than substance.

■ However, there is a further objection which is not one merely of form. In block 34a the coroner is asked to specify "Accident, Suicide or Homicide," and the Romero certificate stated "Accident." Defendant challenges this entry as a mere conclusion or opinion, and not the statement of a fact. Cited is *People* v. *Proctor*, 108 Cal.App.2d 739 [239 P.2d 697], and, more recently, *McClaflin* v. *Bayshore Equipment Rental Co.*, 274 Cal.App.2d 446 [79 Cal.Rptr. 337]. The latter decision relies on *People* v. *Holder*, 230 Cal.App.2d 50 [40 Cal.Rptr. 655], where, as the opinion points out, the death certificate was "admissible proof only of bald factual entries, for example, the fact of death, time and place of death, character of the injuries and time and place of the accident or other trauma-producing event." (P. 55.) Nevertheless, the court in *Holder* declared that while the composite set of facts recorded on the death certificate did not directly demonstrate the cause of death, "It constituted circumstantial evidence, imposing on the trier of fact the necessity of drawing inferences. [Citations.] . . . As prima facie proof, these recorded facts were sufficient unless contradicted and overcome by other evidence. [Citation.] There was no contradictory evidence." (P. 56.)

In the instant case there is not one shred of evidence that the decedent was bent on suicide when he set out on his last, and fatal, journey; too, by

limiting its appeal to the two assignments of error herein discussed, defendant has conceded the sufficiency of the evidence to support the implied jury finding that decedent's death was "accidental." Under all of the circumstances we find no prejudice to defendant's cause.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.