595 P.2d 768

**Mercy SOUTH, Personal Representative and Administratrix of the Estate of Bill South, Deceased, Michael South, a minor, by and through his Mother and next friend, Mercy South, and Mercy South, Individually, Plaintiffs-Appellants,**

v.

**Andy J. LUCERO and Gilbert Lucero, Defendants-Appellees.**

**No. 3509.**

Court of Appeals of New Mexico.

April 3, 1979.

Writ of Certiorari Denied May 1, 1979.

James A. Mungle, Albuquerque, for plaintiffs-appellants.

LeRoi Farlow, LeRoi Farlow, P. A., Albuquerque, for defendants-appellees.

## OPINION

SUTIN, Judge.

This case involves a motorcycle-truck collision that occurred on November 15, 1975, at about 1:00 a. m. on U.S. Highway 60 about five miles west of Datil, New Mexico. Decedent was operating a motorcycle accompanied by his son, Michael. Plaintiffs sued defendants to recover damages for wrongful death of decedent and for personal injuries of Michael. The jury returned a verdict for defendants and plaintiffs appeal from the judgment entered. We affirm.

This appeal centers around two points: (1) whether a proper foundation was laid for the admission in evidence of a toxicology report and blood alcohol test and (2) whether the court erred in admitting the toxicology report in evidence in violation of statutory requirements.

During the events that occurred, the following witnesses established the foundation linkage: (1) Leo Lujan, a deputy medical investigator, the owner of a funeral home in Socorro, who worked under the supervision of Dr. Sidney Auerbach, a district medical investigator in Socorro; (2) Jimmy Clayton Standefer, and (3) Earnest Warren Street, toxicologists employed by the State Medical Investigator to do blood tests; and (4) Dr. Michael Benziger, a pathologist employed by the Office of Medical Examiners in Albuquerque to perform autopsies.

Dr. Auerbach was not available as a witness at the time of trial.

The office of the State Medical Investigator is located at the school of medicine at the University of New Mexico. He appoints physicians as district medical investigators and other persons as deputy medical investigators, each of whom work under the supervision of a district medical investigator. He also promulgates rules and regulations for the proper investigation of deaths and maintains records of deaths which are investigated by the state or district medical investigators. Section 24–11–3, N.M.S.A. 1978.

The State Medical Investigator provides the district medical investigators with vials for proper labeling and sealing of blood specimens and External Examination forms.

Included in the Office of the State Medical Investigator is a laboratory in which toxicologists are employed to perform tests on blood samples of deceased persons. A log sheet form is available. It contains information relative to the types of samples received, by whom taken and sealed, and the dates; by whom transported and received and the dates; the tests requested and a laboratory number. When completed the specimens are put in a test tube rack and placed in a refrigerator, sealed off by lock and key from everyone except the toxicologist. To analyze the blood specimens, a toxicologist will remove the test tube rack with sealed vials, break the seals and perform the tests.

The chain of evidence, link by link, from the death of decedent to the blood alcohol test and the admission in evidence of the toxicology report runs as follows:

On November 15, 1975, at 3 a. m., about 2 hours after the accident, the body of a deceased male was brought by Community Ambulance Service to the funeral home of Lujan in Socorro. It was the only mortuary in the area of the accident. Lujan was told that the body was that of decedent who had been killed in an accident. Dr. Auerbach who drew the specimens from the body at the funeral home, received some telephone calls with reference to decedent. No other body of a person killed in an accident was brought to Lujan's funeral home that morning.

Lujan assisted Dr. Auerbach, who, with use of a syringe, drew three specimens of blood from decedent's body. The specimens were put in three vials, labeled and sealed. Dr. Auerbach also prepared a work sheet report. Lujan saw Dr. Auerbach write that the body from which the specimens were taken was identified as that of decedent.

Dr. Auerbach left the funeral home to go to his office to complete his report. He took with him the sealed vials and work sheet.

Three or four hours later that morning, Dr. Auerbach returned to the funeral home and handed Lujan the sealed vials. Lujan transported the sealed vials and decedent's body to the admitting office of the Bernalillo County Medical Center in Albuquerque. The deliveries were made the morning of November 15, 1975.

The Chief Medical Investigator's Office received an External Examination form filled in with a typewriter and signed by Dr. Auerbach. It identified the body as that of Bill R. South, the decedent. This was the completed report prepared from Dr. Auerbach's worksheet.

Upon arrival of the blood samples, a log sheet form was completed. It showed that the blood samples were taken and sealed by Dr. Auerbach on November 15, 1975, and received by Arthur Wakeman of the Chief Medical Investigator's Office on November 17, 1975.

On November 17, 1975, Standefer received the sealed vials in the laboratory from Arthur Wakeman, checked the vials with the log sheet, verified the seals, saw that the vials were sealed by Dr. Auerbach and saw the name of decedent. He also checked Dr. Auerbach's External Examination form with the log sheet. Standefer assigned the vials laboratory number 475B and replaced the vials in the refrigerator.

On November 18, 1975, Street removed the sealed vials from the refrigerator that were identified with decedent. He broke the seals, tested the blood and concluded that the alcoholic content was .188 percent. He made a toxicology report. The report and the blood test were admitted in evidence.

At the request of plaintiffs, a supplemental test was made of decedent's blood on July 23, 1976. The test showed .190 percent, unusually close when repeated several months later. The results were substantially the same and this toxicology report was admitted in evidence.

Plaintiffs' argument is divided into three categories: "(1) the body from which the blood samples were taken was not properly identified; (2) there were breaks in the chain of evidence prior to the samples being tested; (3) the blood tested could not have been drawn from the body alleged to be that of Bill South [decedent]." We disagree and answer these arguments *seriatim.*

### A. *Decedent's body was properly identified.*

■ Plaintiffs' argument that decedent was not properly identified flows from the failure of defendants to call as witnesses the ambulance driver and Dr. Auerbach. The sequence of events indisputably identify the corpse of decedent as the body from which blood samples were taken. The corpse of a male person was brought to the funeral home in Socorro, the only funeral home in the area of the accident. It was there identified through conversations as that of decedent who had been killed in an accident. The body was transferred to Albuquerque by Lujan where an autopsy was performed by Dr. Benziger, a witness who testified on behalf of plaintiffs with reference to the autopsy. After the post mortem examination, the body was transferred to the mortuary of Fitzgerald & Son in Albuquerque. Before burial, we assume that plaintiffs identified the body as that of decedent. From the time of the arrival of the corpse at Lujan's mortuary in Socorro to the time the body was delivered to the

Albuquerque Mortuary, the body was identified as that of decedent. There was no evidence or suggestion that the body was not that of decedent.

### B. *There was no break in the chain of evidence.*

■ Plaintiffs claim that the missing link in the chain of evidence occurred during the three to six hour hiatus while the vials were in the custody of Dr. Auerbach during his absence from the funeral home. This argument is made because Lujan was unaware of what happened to the samples during Dr. Auerbach's absence. We do know that the vials were labeled and sealed before Dr. Auerbach left the funeral home and after Dr. Auerbach returned them to Lujan. To create a missing link, we would be compelled to assume that during the three or four hour period of Dr. Auerbach's absence, an intermeddler had access to the vials, took possession of them, broke the seals, tampered with the blood samples, put them back in the vials, and sealed them. This procedure might happen in a murder mystery but we cannot accept it as a missing link in this case.

Plaintiffs rely heavily on *Apodaca v. Baca,* 73 N.M. 104, 385 P.2d 963 (1963). In *Apodaca,* prior to the enactment of the Office of Chief Medical Investigator, a missing link occurred in the chain of evidence. On May 23, 1960, a blood sample in a test tube, stoppered, not sealed, with a tag attached and securely wrapped around it, was mailed from Tucumcari to Van Atta Laboratories in Albuquerque. Van Atta no longer performed blood alcohol tests. On May 27, 1960, four days later, Dr. Beighley received a request from the Tucumcari Police Department to test and analyze the blood specimen. Van Atta delivered the blood specimen to Dr. Beighley. Van Atta was an intermediate party. The court said:

When, how, by whom and in what manner or condition the specimen was received by Van Atta Laboratory is not shown by the evidence. How long, where and how the specimen was kept, as well as who had possession of the specimen

from May 23, to May 27, 1960, is also not shown. Neither does the evidence show by whom, how and in what manner or condition the specimen was delivered to Beighley's Laboratory. [73 N.M. at 107, 385 P.2d at 965.]

In *Apodaca*, the blood sample was in the possession of an intermediate agency for four days. The test tube was not sealed. Access by intermeddlers was unknown. The condition of the blood sample from Tucumcari to Van Atta to Beighley was unknown. The missing link was the four day period that the test tube rested in the Van Atta Laboratory.

■ In the instant case, the vials were sealed, labeled and possessed by Dr. Auerbach and Lujan, delivered by Lujan from Socorro to the Bernalillo County Medical Center in Albuquerque and obtained there by Wakeman of the Chief Medical Investigator's laboratory. During this entire period, the vials were labeled and sealed. There was no evidence of tampering. *Abercrombie v. State*, 138 Ga.App. 536, 226 S.E.2d 763 (1976). Intermeddlers could not tamper with the blood samples unless the seals were broken. *State v. Fornier*, 103 N.H. 152, 167 A.2d 56 (1961). The seals were not broken until Street, the toxicologist, made the alcoholic test. As long as the sealed vials were identified as those of Dr. Auerbach, it is immaterial in how many or in whose hands the vials may have been. Neither is it necessary to negate the possibility of an opportunity for tampering with the vials or to trace their custody by placing each of their custodians on the witness stand. Such a rigorous exaction regarding proof is supported neither by reason nor by authority. *State v. Chavez*, 84 N.M. 760, 508 P.2d 30 (Ct.App.1973), in which opinion *Apodaca* was compared. *See State v. Harrison*, 81 N.M. 623, 471 P.2d 193 (Ct.App. 1970) where *Apodaca* was distinguished.

■ *State v. Chavez, supra*, fixed the following guidelines for the admission into evidence of items identified, either visually or by establishing custody of them: (1) The item must be identified from the time it was obtained to the time it was offered in evidence. It suffices if the evidence established is more probable than not that the item was one connected with the case. A preponderance of the evidence is sufficient. (2) Factors to be considered include (a) the nature of the item; (b) the circumstances surrounding the preservation and custody of it; and (c) the likelihood of intermeddlers tampering with it. (3) If the trial judge is satisfied within a reasonable probability that the item has not been changed in important respects, he may permit its introduction in evidence.

The testimony of Lujan, Standefer and Street identified the sealed vials from the time they were obtained to the time they were tested. There was no missing link with reference to the blood test and the toxicology report. The foundation for their admission as evidence was established. *Interstate Life & Accident Insurance Co. v. Whitlock*, 112 Ga.App. 212, 144 S.E.2d 532 (1965); *McCreary v. State*, 165 Tex.Cr.R. 436, 307 S.W.2d 948 (1957); *Commonwealth v. Rick*, 244 Pa.Super. 33, 366 A.2d 302 (1976); *Cook v. State*, 52 Ala.App. 159, 290 So.2d 228 (1974); *Munn v. State*, 257 Ark. 1057, 521 S.W.2d 535 (1975); *Perry v. City of Oklahoma City*, 470 P.2d 974 (Okl.1970) where *Apodaca* is distinguished; *Ritter v. State*, 3 Tenn.Cr.App. 372, 462 S.W.2d 247 (1971); *State v. Walz*, 218 N.W.2d 480 (S.D. 1974); *State v. Auger*, 124 Vt. 50, 196 A.2d 562 (1963).

Plaintiffs rely on *Rose v. Paper Mills Trucking Company*, 47 Mich.App. 1, 209 N.W.2d 305 (1973) and *Nesje v. Metropolitan Coach Lines*, 140 Cal.App.2d 807, 295 P.2d 979 (1956). The deficiencies in proof shown in those cases were established in the instant case.

Furthermore, plaintiffs claim that for foundational purposes, one of the essential criteria is that "the 'qualified person' taking the samples must establish that part of the foundation showing use of sterile equipment." *Lessenhop v. Norton*, 261 Iowa 44, 153 N.W.2d 107 (1967). We note that *Lessenhop* and *Rose* adopted a formula of nine criteria to be proven by a party seeking the introduction in evidence of blood samples,

the fourth of which is, that "the instruments used were sterile." Sterilization was not an issue in either case. Plaintiffs also point to *Steere Tank Lines, Inc. v. Rogers,* 91 N.M. 768, 581 P.2d 456 (1978) where the evidence showed that a deputy medical examiner took a clean dry syringe to draw the sample. However, there was nothing in the record to show that it resulted in an unreliable blood sample.

 Plaintiffs did not object to the admissability of the evidence on this ground. It was raised for the first time on appeal. Plaintiffs developed through Lujan that Dr. Auerbach used a syringe but there the interrogation stopped. If plaintiff had objected that defendant failed to establish sterilization of the syringe and the vials, defendant would have asked Lujan the decisive question. Not having objected, the issue was waived. Presently, we do not deem it necessary to determine the adoption of the nine criteria formula heretofore mentioned. We do say that Dr. Auerbach, a district medical investigator, was not only acting within a quasi-official capacity, but he was independently charged with the duty of acting in accordance with his professional responsibilities. There is no injustice in presuming that Dr. Auerbach performed his duties with reference to sterilization, unless and until contrary evidence is introduced. *See State v. Auger, supra.*

## C. *The blood tests were made from blood taken from decedent's body.*

 Plaintiffs' argument that the blood samples taken in Socorro could not have been those tested by the State Medical Investigator's office is futile. Plaintiffs' claim that Lujan testified the blood samples were drawn on *November 19, 1975* ; that he billed the State Medical Investigator the next day, *November 20, 1975,* for the transportation of the body and blood samples, and that the samples tested were received on *November 17, 1975,* with the testing done on *November 18, 1975.* "How," say plaintiffs, "could the samples have been tested in Albuquerque prior to being drawn in Socorro?"

We assume that the date of *November 19, 1975,* was either a typographical error or an inadvertent date stated in answer to a question asked. Plaintiffs evidently discovered this date in preparation of the appeal. There was no other mention of this date in the trial. The death occurred at 1 a. m. the morning of November 15, 1975. The examination and withdrawal of blood took place in Socorro two hours later. The documents, reports and testimony erase from the record the date of *November 19, 1975,* as the date the samples were drawn.

## D. *Additional claim of missing link.*

Plaintiffs' reply brief adds another claim of "break in the chain" of evidence. For example: What happened to the blood samples from November 15, 1975, when received in the Bernalillo County Medical Center and November 17 when received by Wakeman? What happened to the body of decedent those two days? How was the body preserved since Mr. Lujan did not embalm the body? These questions do not require an answer since defendants had no opportunity to reply. However, we will reply.

Plaintiffs know what happened to the body and the samples during this two day period. Dr. Benziger, plaintiffs' witness, performed an autopsy on decedent's body and it was removed to an Albuquerque mortuary. Plaintiffs do not contend the autopsy was performed on some other corpse. The blood samples remained in the Bernalillo County Medical Center labeled and sealed. There was no missing link. In fact, there is no semblance of suspicion to create a missing link in the chain of evidence.

We hold that a proper foundation was laid for the admissibility of the toxicology report and the blood test.

## E. *The toxicology report was properly admitted in evidence under statute.*

Plaintiffs claim that any report of a medical investigator obtained under § 24–11–6(B), N.M.S.A.1978 is not admissible at trial. The statute reads:

In those cases where the death resulted from a motor vehicle accident on a public

highway, and the state, district or deputy medical investigator performs or causes to be performed a test or tests to determine the alcoholic content of the deceased's blood, a copy of the report of this test shall be sent to the planning division of the state highway department *for the department's use only for statistical purposes. The copy of the report sent of the planning division of the state highway department of the results shall not contain any identification of the deceased and should not be subject to judicial process.* [Emphasis added.]

Plaintiffs misconstrue this statute. The "copy" of the report does not identify the deceased. This report is not subject to judicial process. No limitation is placed on the original report which identifies the deceased person. To disallow its use in civil and criminal cases would render its use valueless. If the legislature had intended to deny judicial process to the original report, it would have inserted this purpose in the statute. Without a limitation, the use is broad and extensive. Its use in the courtroom serves the State in criminal cases and litigants in civil cases.

The toxicology report was properly admitted in evidence under the statute.

F. *Plaintiffs are liable for the costs.*

Plaintiffs filed a complaint and defendant filed a counterclaim. In the judgment rendered, it was ordered that judgment be entered in favor of defendant against plaintiffs *and defendant recover costs expended.*

The judgment also ordered, on motion of plaintiff prior to trial, that the counterclaim of defendant be dismissed with prejudice.

Plaintiffs claim that neither party was the prevailing party and no costs should be awarded either party.

On April 16, 1976, plaintiffs moved the court to strike defendant's counterclaim. The counterclaim sought damages to Gilbert Lucero's truck caused by decedent's negligence. On the day of trial, January 3, 1978, the court announced that Gilbert Lucero, the pick-up owner, had been previously dismissed as a party. We assume the

court sustained plaintiffs' motion. The counterclaim was not tried before the jury.

Rule 54(d) of the Rules of Civil Procedure provides that in a judgment "costs shall be allowed as of course to the prevailing party *unless the court otherwise directs.*" [Emphasis added.]

" 'To the prevailing party' means the party who wins the lawsuit." *Read v. Western Farm Bur. Mut. Ins. Co.,* 90 N.M. 369, 376, 563 P.2d 1162 (Ct.App.1977).

The matter of assessing costs lies within the discretion of the trial court. Unless an abuse of discretion is shown, we will not interfere with the discretion exercised. *Hales v. Van Cleave,* 78 N.M. 181, 429 P.2d 379 (Ct.App.1967). There was no abuse of discretion. Even if we were to consider plaintiffs to be a prevailing party, which we do not, the trial court in its discretion can "otherwise direct" which party shall be allowed costs. The court did not "otherwise direct." Plaintiffs lost the lawsuit and must suffer the payment of defendant's costs.

Affirmed.

IT IS SO ORDERED.

HENDLEY and LOPEZ, JJ., concur.