898 P.2d 1235

Catherine DADDOW, Plaintiff–Appellant, and Cross–Appellee,

v.

CARLSBAD MUNICIPAL SCHOOL DIS-TRICT and the Carlsbad Municipal School Board of Education, Defendants–Appellees, and Cross–Appellants.

No. 21284.

Supreme Court of New Mexico.

May 2, 1995.

Rehearing Denied June 14, 1995.

Benny R. Naranjo, Albuquerque, for appellant and cross-appellee.

Heidel, Samberson & Newell, Lewis C. Cox, III and Michael Newell, Lovington, for appellees and cross-appellants.

OPINION

FRANCHINI, Justice.

Catherine Daddow appeals from a judgment dismissing her complaint in favor of the Carlsbad Municipal School District and the Carlsbad Municipal Board of Education (hereinafter collectively called "the District"). Daddow brought an action under 42 U.S.C. § 1983 (1988), alleging denial of due process and stating a cause of action for breach of employment contract and wrongful termination. After a bench trial, the court concluded that the District could not be sued under § 1983, that the District did not breach Daddow's employment contract by wrongfully terminating her, and that even if a cause of action under § 1983 did exist, Daddow was afforded all process that the Constitution requires both before and after her termination.

The District filed a cross-claim alleging that as a result of Daddow's negligent and wrongful acts, the federal government required the District to reimburse over $60,000 to the United States Department of Agriculture. The District requested an award of damages for this loss. The court found that Daddow's failure to comply with federal regulations resulted in the loss to the District, that Daddow failed to correct deficiencies noted by the federal auditor, and that Daddow's failure to properly do her job was just cause for her termination. The court refused to award damages to the District, however, because the District could not show that Daddow directly benefitted from her malfeasance. The court ruled that the District's only recourse against Daddow was to terminate her employment. The District cross-appeals from this decision.

We conclude that the District, the Board, and its members are not absolutely immune from suit under § 1983. On the merits, the District showed that Daddow received due process and is therefore entitled to recover its costs in defending the suit. We further conclude that the District cannot recover the reimbursements from Daddow. We reverse in part but affirm the judgment of the trial court.

■ *I. Local school boards and their members acting in their official capacities are "persons" for purposes of actions based on § 1983.* Section 1983 states, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The trial court dismissed Daddow's cause of action under § 1983 because it believed that school boards and their members are absolutely immune from suit due to the holding in *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The District offers the following analysis in support of the trial court's dismissal. Under *Will,* neither the State nor state officers sued in their official capacities are "persons" under § 1983 except in an action for injunctive relief.[1] 491 U.S. at 71 & n. 10, 109 S.Ct. at 2312 & n. 10. *Will* based this holding, in part, upon the fact that a state is protected from suit for money damages in federal court under the Eleventh Amendment and the inference that Congress must not have intended different treatment in state court. *Id.* at 66–67, 109 S.Ct. at 2309–10. The Tenth Circuit has held that New Mexico school boards are "arms of the state" for purposes of the Eleventh Amendment. *See Martinez v. Board of Educ.,* 748 F.2d 1393, 1396 (10th Cir.1984). Therefore, neither school boards nor school board mem-

---

**1.** State officials sued in their personal capacities *are* "persons" under § 1983. *Hafer v. Melo,* 502 U.S. 21, 23, 112 S.Ct. 358, 360, 116 L.Ed.2d 301 (1991).

bers acting in their official capacities may be sued for money damages under § 1983 in either state or federal court. After carefully analyzing our constitutional provisions and statutes, the relevant cases that have examined both the characterization of school boards and the application of § 1983, and the purpose of § 1983, we conclude that the Tenth Circuit decision is erroneous and that our local school districts and their boards are "persons" under § 1983.

*A. The purpose of § 1983 according to Monell.* The question before the Court in *Monell v. Department of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), was "[w]hether local governmental officials and/or local independent school boards are 'persons' within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities." *Id.* at 662, 98 S.Ct. at 2021. In answering that question affirmatively, the Court examined the precursor to § 1983, the Civil Rights Act of 1871. *See Monell*, 436 U.S. at 669, 98 S.Ct. at 2024-25. The Court first determined that the word "persons" covered more than natural persons, and was intended to cover legal persons as well. *Id.* at 683, 98 S.Ct. at 2032. The Court also noted that the meaning of the word "person" was applied "to bodies politic and corporate ... unless the context shows that such words were intended to be used in a more limited sense," and that a municipality is a "body politic and corporate." *Id.* at 688, 98 S.Ct. at 2034-35 (quoting Act of Feb. 25, 1871, § 2, 16 Stat. 431 (the Dictionary Act)). In looking at the legislative history of the Civil Rights Act, the Court stated that the Act was "intended to give a broad remedy for violations of federally-protected civil rights." *Id.* at 685, 98 S.Ct. at 2033. Therefore, the Court concluded, "since municipalities through their official acts could, equally with natural persons, create the harms intended to be remedied by [the Civil Rights Act], and, further, since Congress intended [the Act] to be broadly construed, there is no reason to suppose that municipal corporations would have been excluded from the sweep of [the Act]." *Id.* at 685-86, 98 S.Ct. at 2033.

■ Congress *did* intend municipalities and other local government units to be

included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Id.* at 690, 98 S.Ct. at 2035-36. The *Monell* Court also overruled *Monroe v. Pape*, 365 U.S. 167, 191-92, 81 S.Ct. 473, 486-87, 5 L.Ed.2d 492 (1961), in which the Court had previously held that municipalities were not "persons" under § 1983. *Monell*, 436 U.S. at 701, 98 S.Ct. at 2041. However, the *Monell* Court pointed out that even under the more restrictive *Monroe* approach, school boards had always been "persons" for the purposes of § 1983. *Id.* at 696-97, 98 S.Ct. at 2038-39. The Court noted that both municipalities and school boards are "instrumentalities of state administration." *Monell*, 436 U.S. at 696, 98 S.Ct. at 2038. It also emphasized that Congress had "rejected efforts to strip the federal courts of jurisdiction over school boards." *Id.* We interpret *Monell's* broad holding that *all* "local governing bodies" are subject to suit under § 1983 to create a presumption that local school boards are included within the meaning of "person." *See Howlett v. Rose*, 496 U.S. 356, 376, 110 S.Ct. 2430, 2443, 110 L.Ed.2d 332 (1990) (stating that state courts must adhere to the Supreme Court's interpretation that local governing bodies are "persons" under § 1983); John E. Nowak et al., *Constitutional Law* 55 (2d ed. 1983) ("[M]unicipal corporations, counties and school boards may be sued in federal court without raising an eleventh amendment issue." (footnotes omitted)). This presumption, based on § 1983's strong protective purposes, can be overcome only by conclusive evidence that a local school board is legally only a state agency subject to the state's control. We must determine whether our local school boards are local governing bodies.

■ *B. The Mt. Healthy test.* We find guidance for determining whether an entity is a local governing body from *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977). *Mt. Healthy* held that an Ohio school board was not immune from suit under the Eleventh Amendment. 429 U.S. at 280, 97 S.Ct. at 572–73. In its analysis, the Court examined "the nature of the entity created by state law." *Id.* The Court gave several reasons for deciding that the school board was not an "arm of the state." These reasons included the facts that (1) under state law, the term "state" did not encompass "political subdivisions" such as local school districts, (2) even though the boards received guidance and significant money from the state, local boards had extensive powers to issue bonds and to levy taxes within restrictions, and (3) a board was more like a county or city than it was like an "arm of the state." *Id.* Accordingly, under *Mt. Healthy*, the local school board was not entitled to Eleventh Amendment immunity even though it was entitled to state governmental immunity in the same degree as the state in state tort suits. A determination of whether an entity is a local governing body depends upon state law.

*C. Will did not limit Monell.* We previously noted in dicta that *Will* "made it clear that the [Bernalillo Board of Education] and its members in their official capacities were not subject to suit for money damages under § 1983." *Carrillo v. Rostro*, 114 N.M. 607, 610, 845 P.2d 130, 133 (1992). Despite this sweeping statement, however, *Will* actually stands only for the more limited proposition that "a State is not a person within the meaning of § 1983." *Will*, 491 U.S. at 64, 109 S.Ct. at 2308. The *Will* Court stated that § 1983 provides a "federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity." *Id.* at 66, 109 S.Ct. at 2309. The Court

emphasized, however, that the scope of the Eleventh Amendment and that of § 1983 were separate issues, *id.*, and concluded that § 1983 was not intended "to disregard the well-established immunity of a State from being sued without its consent." *Id.* at 67, 109 S.Ct. at 2310. The Court stated that *Monell* was fully consistent with its reasoning because "[b]y the end of the 19th century, courts regularly held that in imposing a specific duty on the municipality either in its charter or by statute, the State had impliedly withdrawn the city's immunity from liability for the nonperformance or misperformance of its obligation." *Id.* at 68–69 n. 7, 109 S.Ct. at 2310 n. 7 (quoting *Owen v. City of Independence*, 445 U.S. 622, 646, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980)). In contrast to *Monell*, in which the Court noted that Congress intended school boards to be subject to actions under § 1983, *Monell*, 436 U.S. at 696, 98 S.Ct. at 2038–39, in *Will* the Court stated that it could find nothing substantial in the Civil Rights Act's legislative history to convince it that Congress intended the word "person" to include the "States of the Union," *Will*, 491 U.S. at 69, 109 S.Ct. at 2311. The Court also noted that the phrase "body politic and corporate" did not include the States. *Id.*

■ *D. A local board of education in New Mexico is not an "arm of the state."* The *Will* Court noted that *Monell* limited its holding "to local government units which are not considered part of the State for Eleventh Amendment purposes," *Will*, 491 U.S. at 70, 109 S.Ct. at 2312 (quoting *Monell*, 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54), and limited its own holding to "States or governmental entities that are considered to be 'arms of the State' for Eleventh Amendment purposes." *Id.* (citing to *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572–73). *Monell* held that "person" applies to "bodies politic and corporate" notwithstanding state Eleventh Amendment protection. 436 U.S. at 669, 98 S.Ct. at 2024–25; *see also Will*, 491 U.S. at 77, 109 S.Ct. at 2315–16 (Brennan, J., dissenting) (stating that in a "case brought in state court, the Eleventh Amendment can

hardly be 'a consideration,' ... in a suit to which it does not apply"). If an entity is a "person," as *Will* noted, the state has waived any immunity it might otherwise have had under the Eleventh Amendment. Harmonizing *Monell* and *Will,* we see that if an entity is a local governing body with specific discretionary powers and duties, it is not a true "arm of the state" and is not entitled to the state's Eleventh Amendment protections.

*1. Martinez did not consider whether a local board is a "person" under § 1983.* In a case based upon a school board's alleged violation of an employee's First Amendment rights, the Tenth Circuit held that in New Mexico a local board of education is an "arm of the state" for Eleventh Amendment immunity purposes, and that the federal trial court correctly dismissed the board and its members sued in their official capacities from liability under the § 1983 suit. *Martinez,* 748 F.2d at 1396. The court did not determine if a local board was a "person" under *Monell. Martinez* cited to Article XII, Section 6 of the New Mexico Constitution as support for its finding that the State Board of Education has pervasive control of all local boards. That Article provides that the State Board has "control, management and direction of all public schools, pursuant to authority and powers provided by law." N.M. Const. art. XII, § 6. We have previously concluded, however, that Section 6 is not self-executing, *Amador v. New Mexico State Bd. of Educ.,* 80 N.M. 336, 337, 455 P.2d 840, 841 (1969), and the State Board's control is limited to its statutory powers enumerated under NMSA 1978, Sections 22–2–1 and 22–2–2 (Repl.Pamp.1993). The Legislature has given local boards exclusive power over employment and discharge of school employees. Section 22–5–4(D). Thus, the State Board does not have even supervisory control in that area. *See Bourne v. Board of Educ.,* 46 N.M. 310, 315, 128 P.2d 733, 736 (1942).

Under the second prong of *Mt. Healthy,* the *Martinez* court also found that the State Board fully controls the fiscal-budgetary matters of all schools, that the taxing method for the schools is statewide, and that the funds from the state are applied on a formula to equalize funding. *Martinez,* 748 F.2d at 1396. Because its focus was on the Eleventh Amendment, the court did not consider whether the state may have waived immunity by also giving its local school boards specific duties and powers such that they are local governing bodies. *See Will,* 491 U.S. at 68–69 n. 7, 109 S.Ct. at 2310–11 n. 7. The Tenth Circuit failed to consider the *Monell* principle that there is no "basis for concluding that the Eleventh Amendment is a bar to municipal [and by implication, local school board] liability," *see* 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54.

The Supreme Court in *Howlett,* 496 U.S. at 375, 110 S.Ct. at 2442, concluded that any decision holding that "governmental entities subject to § 1983 liability enjoy an immunity over and above those already provided in § 1983" would violate federal law. *Id.* at 375, 110 S.Ct. at 2442. It further stated that since the Supreme Court "has held that municipal corporations and similar governmental entities are 'persons' ... a state court entertaining a § 1983 action must adhere to that interpretation." *Id.* at 376, 110 S.Ct. at 2443 (citing *Monell, Will,* and *Mt. Healthy* ). A court need not re-examine whether a particular local school board is a "person" each time a different school district is sued unless there is a real question under state law of whether local school boards are political subdivisions. In California, for example, local boards are indivisible agencies of the state. Thus, in *Belanger v. Madera Unified School District,* 963 F.2d 248, 251 (9th Cir.1992), *cert. denied,* 507 U.S. 919, 113 S.Ct. 1280, 122 L.Ed.2d 674 (1993), the court held that local California school boards were "arms of the state." It based this holding upon three factors: first, any judgment against a school district would be satisfied out of state funds; second, under California law, school districts are state agencies; and third, school districts perform central government functions. *Id.* In California, the state government even dictates when a student may be expelled. *Id.* at 253.

The *Howlett* Court stated that "by including municipalities within the class of 'persons'

subject to liability for violations of the Federal Constitution and laws, Congress ... abolished whatever vestige of the State's sovereign immunity the municipality possessed." *Howlett*, 496 U.S. at 376, 110 S.Ct. at 2443 (quoting *Owen v. City of Independence*, 445 U.S. 622, 647–48, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980)). While *Howlett* focused on state sovereign immunity rather than Eleventh Amendment immunity, the implication of that statement is that Eleventh Amendment immunity also does not apply to a political subdivision in a § 1983 action. *See Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 813 (3d Cir.1991) (en banc) (stating that "political subdivisions are not 'State[s]' under the Eleventh Amendment"), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992).

 *2. Martinez did not consider all of the Mt. Healthy factors.* The *Martinez* court failed to fully consider some key aspects regarding a local school board's autonomy and also did not take all of the *Mt. Healthy* factors into consideration. As mentioned above, there are three factors to consider under *Mt. Healthy:* 1) what the state law calls the entity; 2) whether the entity has political and financial autonomy; and 3) whether the entity operates like a political subdivision.

*a. Local school boards are statutorily defined as "local public bodies."* The *Martinez* court did not examine the first factor or acknowledge that in New Mexico, the term "state" or "state agency" is defined for purposes of governmental immunity as "the state of New Mexico or any of its branches, agencies, departments, boards, instrumentalities or institutions," NMSA 1978, § 41–4–3(G) (Repl.Pamp.1989), while a "local public body" is defined as "all political subdivisions of the state and their agencies, instrumentalities and institutions.…" Section 41–4–3(C). Therefore, while the State School Board is a state agency, a local school board is a "local public body." This factor is crucial because, as stated above, in *Will* the Court acknowledged that when a state imposes a specific

duty on a political subdivision, the state implicitly revokes immunity for suits involving that duty. 491 U.S. at 68–69 n. 7, 109 S.Ct. at 2310–11 n. 7. Further, under the New Mexico Constitution, a local school district is not designated as a state educational institution. *See* N.M. Const. art. XII, § 11. Under the first *Mt. Healthy* factor, our local school boards are local governing bodies, not "arms of the state."

*b. Local school boards have significant political and financial autonomy.* New Mexico local school boards have been given several exclusive powers with which to carry out their duty to locally "supervise and control all public schools within the school district and all property belonging to or in the possession of the school district." Section 22–5–4(A). For example, local boards may "contract, lease, purchase and sell for the school district," Section 22–5–4(G); and may "issue general obligation bonds of the school district," Section 22–5–4(K).

"A central concern in assessing the financial autonomy factor is whether an entity has the power to levy taxes and issue bonds, in order that a judgment may be payed without resort to the general revenues of the state." *Board of Trustees v. Landry*, 638 N.E.2d 1261, 1264 (Ind.Ct.App.1994). The fact that our local school boards may issue bonds weighs heavily in favor of their autonomy and against their characterization as "arms of the state."

The *Martinez* court found that the State Board had pervasive financial control over all school districts because the Public School Finance Act, NMSA 1978, §§ 22–8–1 to –42 (Repl.Pamp.1993), provides that the State Board conduct budget-making with the local board. 748 F.2d at 1395. The court did not consider, however, that the local board determines priorities for spending and has discretion in spending funds generated under the Act as long as special needs programs are met. Section 22–8–17.

Critically, we note that under Section 22–19–16, no obligation issued by a local school board may be charged against or become a

debt of the state or any of its political subdivisions. A local school board may also "adopt regulations pertaining to the administration of all [its] powers or duties." Section 22–5–4(O). Although the *Martinez* court opined that the state has "pervasive" control, management, and direction of public schools, this control is only in the form of guidance by regulation, not by actual physical control of the entities. As the Tenth Circuit stated, even broad supervisory power is "still 'supervisory' and not 'control.'" *Unified Sch. Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1123 (10th Cir.1978).

Finally, the New Mexico Constitution provides that judgments rendered against a city, county, school district, or board of education "shall be paid out of the proceeds of a tax levy as other liabilities ... and when so collected shall be paid by the county treasurer to the judgment creditor." N.M. Const. art. VIII, § 7. The *Martinez* court found NMSA 1978, Section 7–37–7(C)(3) (Repl. Pamp.1993) to be the implementing statute for that provision, and stated that the provision was limited to judgments arising from tort or contract actions. *Martinez*, 748 F.2d at 1395. The court determined that constitutional violations were not torts; thus a judgment arising from such a violation would not be paid out of such levies. *Id.* The court then concluded that because federal district courts had previously held that judgments for § 1983 actions would be paid out of state funds, the boards were "arms of the state." We agree with the Tenth Circuit's later statement that "[t]he proper analysis focuses on whether the damage award would be paid directly by the state treasury, rather than indirectly through commingled state and local funds or state indemnification provisions." *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 996 (10th Cir.1993) (en banc).

Section 41–4–20 of the Tort Claims Act requires that all "local public bod[ies] ... purchase insurance, establish reserves or provide a combination of insurance and reserves or provide insurance in any other manner authorized by law" for liabilities not covered under the Act. NMSA 1978, § 41–

4–20(A)(1)(c) (Repl.Pamp.1989). The *Martinez* court noted this statute, *Martinez*, 748 F.2d at 1395, but focused only on the "reserves" aspect of that requirement. It concluded that if a board elected to establish reserves, the reserves would be funded with state funds. Once funding has been allocated to a local district, however, it becomes local district reserves and no longer is part of the state treasury.

We do not answer the question of whether Section 7–37–7(C)(3) applies to judgments arising from constitutional violations, but we note that whether it does or does not, Section 41–4–20 ensures that such liabilities will not be imposed upon the state treasury. *See Garcia v. Board of Educ.*, 777 F.2d 1403, 1416 (10th Cir.1985) (McKay, J., dissenting in part and concurring in part) (explaining why Section 7–37–7(C)(3) should be interpreted to include civil rights judgments). Section 7 of Article VIII, Section 7–37–7(C)(3), and Section 41–4–20 show that, generally, school district liabilities are *not* paid directly from state funds. Our local boards, like those described in *Mt. Healthy, Epperson,* and *Landry,* maintain significant managerial and fiscal autonomy.

■ *c. Local school boards operate like other political subdivisions.* We further believe that in an "arm of the state" analysis for purposes of a § 1983 action, the courts are to analyze the general nature of an entity. Local board members are elected by popular vote from residents of the counties or precincts that form the particular district. Section 22–5–1. The boards may "acquire and dispose of property," Section 22–5–4(H); and also "have the capacity to sue and be sued," Section 22–5–4(I). We recognize that the sale of school district property valued at more than $5000 must be approved by the state department of public education, but we also note that other local public bodies (except for municipalities) must also obtain approval for the sale of their property from the local government division of the department of finance and administration. NMSA 1978, § 13–6–2 (Repl.Pamp.1992). Significantly,

the legislature defined "school districts" for the purposes of this statute as "those *political subdivisions* of the state established for the administration of public schools." Section 13–6–4(D) (emphasis added). Obviously, the requirement for state approval does not make a political subdivision an "arm of the state." School districts operate independently, like counties and municipalities.

Our analysis of the three *Mt. Healthy* factors leads to the conclusion that New Mexico school districts and their boards are political subdivisions and not "arms of the state." *See Garcia,* 777 F.2d at 1411–17 (McKay, J., dissenting) (stating that an application of all of the *Mt. Healthy* factors leads to the conclusion that New Mexico school boards are not "arms of the state"); *cf. Edelman v. Jordan,* 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1358 n. 12, 39 L.Ed.2d 662 (1974) (stating that a county does not occupy the same Eleventh Amendment position as a state notwithstanding that a county's actions are state action for purposes of the Fourteenth Amendment); *Moor v. County of Alameda,* 411 U.S. 693, 718–20, 93 S.Ct. 1785, 1800–01, 36 L.Ed.2d 596 (1973) (holding that a county was a "citizen" for jurisdictional purposes because it was given corporate powers; was a body corporate and politic; could sue and be sued; was deemed to be a local public entity in contrast to the state and its agencies; could sell, hold, or deal in property; and could issue bonds that created no obligation on the part of the state); *Landry,* 638 N.E.2d at 1264–66 (determining that Indiana school districts are not "arms of the state" by using a similar analysis); *Elder v. Highlands County Bd. of County Comm'rs,* 497 So.2d 1334, 1336 (Fla.Dist.Ct.App.1986) (stating that a county's "effort to remove itself from *Monell* and the reach of section 1983 by claiming status as a subdivision of the state [and protection under Eleventh Amendment immunity] originates in a misunderstanding of the Supreme Court's comment that '[o]ur holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes,'" and holding that a county was not protected by the Eleventh Amendment).

*3. Martinez is inconsistent with the majority of school board cases.* The overwhelming majority of courts have held that local school boards are not "arms of the states." *See Monell,* 436 U.S. at 663 & n. 5, 98 S.Ct. at 2021–22 & n. 5 (citing a dozen Supreme Court cases brought under § 1983 in which the principal defendant was a school board); *Ambus,* 995 F.2d at 994–95 (listing ten cases in which courts have found no Eleventh Amendment immunity); *Landry,* 638 N.E.2d at 1266 (holding that Indiana school districts are subject to suit under § 1983). It seems that the *Martinez* opinion is an anomaly to Tenth Circuit application of the *Mt. Healthy* factors. In the *Ambus* opinion, the court noted that it had denied immunity to school districts in Kansas and Wyoming, assuming that *Mt. Healthy* had resolved the issue in the Wyoming case. 995 F.2d at 994. The *Ambus* court also found no Eleventh Amendment immunity for a local school board in Utah. *Id.* at 997. Utah, like New Mexico, characterizes its local boards as political subdivisions, *id.* at 995; grants its State Board governing authority but not local authority, *id.* at 996; funds its school districts with public funds, *id.;* and requires its boards to obtain insurance against adverse judgments, *id.* at 997. Because New Mexico's local school boards are so similar to those of Utah, Kansas, and Wyoming, we are hard-pressed to understand the different result arrived at in *Martinez.* We conclude that *Martinez* reached its conclusion because it neither recognized the *Monell* presumption nor considered all of the *Mt. Healthy* factors, and we decline to regard that case as persuasive authority.

We conclude that *Monell* requires that local school boards be considered "persons" for the purposes of § 1983 unless they are in fact state agencies or "arms," and that under *Howlett,* a § 1983 action against a political subdivision of the state is not barred in New Mexico by any statutory governmental immunity. We find, under *Mt. Healthy,* that our local school boards are local governing bodies with political and fiscal autonomy. Our local school boards are indeed "persons"

subject to liability under § 1983. We therefore hold that the trial court improperly dismissed Daddow's § 1983 action. This holding, however, does not mean that Daddow should have prevailed on the merits of her action.

■■■■ *II. Daddow received due process.* The trial court alternatively ruled that if Daddow could have brought a § 1983 action against the District alleging failure to extend due process, that claim would fail on its merits because the District fired Daddow for just cause (deficient job performance) and in a manner conforming with due process. The unchallenged findings and an examination of the record support this conclusion. *See Wood v. Citizens Standard Life Ins. Co.,* 82 N.M. 271, 273, 480 P.2d 161, 163 (1971) (findings not directly attacked are binding on this Court); *Entertainment Corp. of Am. v. Halberg,* 69 N.M. 104, 105, 364 P.2d 358, 359 (1961) (findings supported by substantial evidence will be sustained on appeal). It is uncontroverted that the District offered Daddow a post-termination hearing, at which she declined to appear. The trial court also found that Daddow had opportunities prior to termination to address the allegations against her. When an employee who may be terminated only for just cause is fired, due process requires "oral or written notice of the charges against [the employee], an explanation of the employer's evidence, and an opportunity to present [the employee's] side of the story." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). Daddow received due process.

■■■■ *III. The trial court properly interpreted NMSA 1978, Section 22–5–4(D) (Cum. Supp.1992).* At the meeting in which Daddow was terminated, the Carlsbad superintendent of schools recommended that Daddow's employment be continued instead of terminated. Section 22–5–4(D), which governs termination of school employees, states, in part:

A local school board shall have the following powers or duties: ... (D) subject to the provisions of law, approve or disapprove the ... termination or discharge of all employees ... upon a recommendation of ... termination or discharge by the superintendent of schools. Any ... termination or discharge without the prior recommendation of the superintendent is void

. . . .

Daddow interprets this statute to mean that a school board may not terminate an employee unless the superintendent positively recommends that termination. The Board, however, is the only entity with the power to terminate employees. *Gallegos v. Los Lunas Consol. Sch. Bd. of Educ.,* 95 N.M. 160, 161–62, 619 P.2d 836, 837–38 (Ct.App.), *cert. quashed,* 95 N.M. 299 (1980). "Recommendation refers to an action which is advisory in nature rather than one having any binding effect." Black's Law Dictionary 1272 (6th ed. 1990). We agree with the District that the purpose of this statute is to require input of a superintendent before a personnel decision is made, and not to render a board powerless to act except in accordance with the recommendation of its superintendent. Had the Legislature intended to give a superintendent the absolute power over hiring and termination, it could easily have required the superintendent's "approval" of the board's actions instead of requiring only a "recommendation".

■■■■ *IV. The trial court correctly awarded costs to the District as the prevailing party.* Under SCRA 1986, 1–054(E) (Repl.Pamp.1992), "costs shall be allowed as a matter of course to the prevailing party unless the court otherwise directs." A ruling on costs will not be disturbed absent a finding of abuse of discretion. *Pioneer Sav. & Trust v. Rue,* 109 N.M. 228, 231, 784 P.2d 415, 418 (1989). Although the trial court characterized its judgment as a dismissal of Daddow's complaint, because the dismissal was made after a full trial on the merits, it is treated as a judgment on the merits. *Herbert v. Sandia Savs. & Loan Ass'n,* 82 N.M. 656, 657, 486 P.2d 65, 66 (1971). The "prevailing party" is the one that wins the suit. *South v. Lucero,* 92 N.M. 798, 804, 595 P.2d

768, 774 (Ct.App.), *cert. denied,* 92 N.M. 675, 593 P.2d 1078 (1979). The District won the suit and therefore was entitled to costs; Daddow presented no cogent argument explaining how the court abused its discretion in awarding them.

■ *V. The District is not entitled to reimbursement from an employee of federal monies lost due to the negligence of that employee.* The District alleges error in the trial court's ruling that it could not recover damages resulting from Daddow's failure to comply with federal regulations. The court found that although Daddow was negligent in her job performance, the District was not entitled to recover that loss unless it could show that Daddow directly benefitted from her failures. The District presented its claim in terms of common-law negligence, but we see it as a request to hold an employee liable for indemnification.

■ It is the general rule that an employer may bring an action for negligence against its employee for "whatever ... damage is occasioned by the employee's failure to exercise reasonable care and diligence." *See* 53 Am.Jur.2d *Master & Servant* § 108 (1970). We note, however, that the legislature has statutorily altered this rule for government employees. NMSA 1978, Section 41–4–17 (Repl.Pamp.1989) provides that "a governmental entity ... shall have no right to contribution, indemnity or subrogation against a public employee unless the public employee has been found to have acted fraudulently or with actual intentional malice causing the ... property damage ... resulting in the settlement or final judgment." While this provision may not directly address the District's claim, it does provide us with guidance in reviewing the trial court's decision. In light of the legislature's reluctance to require indemnity in the absence of fraud or intentional malice, and given the facts of this case, we find that the trial court properly exercised its equitable powers to bar recovery on a finding of only negligent behavior.

Daddow presented evidence that Daddow's supervisor, the Superintendent, believed that the losses the District suffered were not entirely Daddow's fault, and that she should not be terminated. Other evidence showed that Daddow was more than likely inept. An "employer's remedy is to fire the employee for ineptness or lack of diligence." *Fried v. Aftec, Inc.,* 246 N.J.Super. 245, 587 A.2d 290, 297 (Ct.App.Div.1991). Further, Daddow showed that the District was aware that she either was not capable of properly complying with the federal regulations or did not fully understand the process in 1988. She also demonstrated that the District reprimanded her for her failures, yet took no steps to train her or to ensure compliance. "An employer cannot give an employee negative fitness reports, retain the employee, and later sue [that employee] for failure to perform the agreement or for overall negligence or carelessness, allegedly causing the company financial losses." *Id.* Finally, there are special considerations when the employer is a public employer. *Cf. United States v. Gilman,* 347 U.S. 507, 509–13, 74 S.Ct. 695, 696–98, 98 L.Ed. 898 (1954) (holding that the federal government is not entitled to assert a common-law right of indemnity against an employee whose negligence has made the employer liable). We affirm the decision of the trial court.

*VI. Conclusion.* We reverse the decision of the trial court on the question of whether a § 1983 action for money damages may be brought against a local school board and affirm the judgment of the trial court.

IT IS SO ORDERED.

RANSOM, J., concurs.

FROST, J., specially concurs and files opinion in which BACA, C.J., joins.

MINZNER, J., concurs in part and dissents in part.

FROST, Justice, specially concurring.

I specially concur with the majority opinion. I do so because I do not believe the opinion should address the issue of whether

or not Daddow had a claim under 42 U.S.C. § 1983 (1988). The opinion holds that she was given due process with regard to her termination. A consideration and discussion of the applicability of § 1983 actions to school districts is therefore unnecessary. Resolution of this issue should await a proceeding wherein it must necessarily be decided after adequate briefing and possibly oral argument. I concur in parts II, III, IV, and V of the majority opinion and in the affirmance of the trial court's decision.

*I. The Majority Unnecessarily Reinterprets U.S. Supreme Court Precedent.*

The majority opinion is almost entirely devoted to an unnecessary examination of whether the term "person" as used in § 1983 includes local school boards.[1] In the first prong of its analysis under Part I, the majority reinterprets the U.S. Supreme Court cases that defined the scope of the term "person." The majority concludes that the analysis of what is a "person" under § 1983 is different from the analysis of what is deemed not to be an "arm of the state" for purposes of the Eleventh Amendment. The majority finds that the Supreme Court cases establish a "presumption" that a local school board is a "person" under § 1983 unless there is "conclusive evidence that [it] is legally only a state agency subject to a state's control." Majority Opinion at 100, 898 P.2d at 1238. According to the majority, this evaluation of the status of a school board does not require a determination of the board's status under the Eleventh Amendment although Eleventh Amendment considerations provide some guidance. *Id.*

However, a straightforward analysis of the relevant cases defining "person" suggests otherwise. Contrary to the majority's conclusion, the relevant Supreme Court cases hold that the status of a local school board under § 1983 is conclusively determined by its status under an Eleventh Amendment

"arm of the state" analysis. Unfortunately, the majority's unique interpretation of the scope of the term "person" under § 1983, which is unnecessary for the holding of the opinion, places us in direct conflict with the U.S. Supreme Court's holdings and fails to follow the standard approach to § 1983 claims.

**A. *Monell* Applies to Local Governing Bodies that are not Arms of the State.**

In *Monell v. Department of Social Services,* 436 U.S. 658, 662, 98 S.Ct. 2018, 2021, 56 L.Ed.2d 611 (1978), the U.S. Supreme Court addressed the question of whether the New York City board of education was a "person" within the meaning of § 1983. After analyzing the statutory history of § 1983, the Court concluded that local governing bodies were "persons" under § 1983 and, accordingly, could be sued. *Id.* at 690, 98 S.Ct. at 2035–36. However, the Court explicitly limited the reach of its holding, noting, "Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes." *Id.* at 690 n. 54, 98 S.Ct. at 2035 n. 54; *see also id.* at 690 n. 55, 98 S.Ct. at 2036 n. 55 (limiting its analysis to actions "where Eleventh Amendment considerations do not control [the] analysis"); *id.* at 695, 98 S.Ct. at 2038 ("[W]e have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be."). In fact, even though this case was initiated in federal court, and would ordinarily require an Eleventh Amendment immunity analysis, the Court did not consider whether the local school board was entitled to immunity from suit under the Eleventh Amendment. Instead, the Court operated under the assumption that it lacked immunity. *Id.* at 690 n. 54, 98 S.Ct. at 2035 n. 54.

**B. *Will* Applies to Local Governing Bodies that are Arms of the State.**

The U.S. Supreme Court next addressed whether the term "person" included the

---

1. The relevant portions of § 1983 are set out in the majority opinion. *See* Majority Opinion at 99, 898 P.2d at 1237.

states in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Court concluded that the term "person" did not encompass the states, primarily based on Eleventh Amendment considerations. *Id.* at 66–67, 109 S.Ct. at 2309–10. The Court noted that the Eleventh Amendment granted the states immunity from suit in federal court, and that Congress would not have intended to revoke this constitutionally granted immunity unless it expressly exercised its power to do so under the Fourteenth Amendment. *Id.* at 66, 109 S.Ct. at 2309–10. Accordingly, it concluded that the definition of "person" did not include the states, so as to conform with the principles of the Eleventh Amendment.

However, the § 1983 suit at issue in *Will* was originally brought in state court where the Eleventh Amendment did not apply. *Id.* at 60, 109 S.Ct. at 2306. The Court concluded that Congress did not intend for § 1983, a remedial federal statute, to create a cause of action against a state in state courts while denying a parallel cause of action in federal courts. *Id.* at 66, 109 S.Ct. at 2309–10. Accordingly, the Court held that although the Eleventh Amendment did not apply in state courts, the Eleventh Amendment considerations that limit the definition of "person" in federal courts also apply to limit the definition of "person" in state courts. *Id.* Indeed, once the Court held that Eleventh Amendment considerations inform the statutory definition of "person" in federal cases, its application of Eleventh Amendment considerations in state court § 1983 claims was logically necessary to prevent the term "person" from having different meanings in state and federal court.

Furthermore, the *Will* Court concluded that the immunity that states enjoyed under § 1983 also extended to state officials sued in their official capacity. *Id.* at 71, 109 S.Ct. at 2312. This conclusion was a logical extension of the limitation on § 1983 suits against states. A party should not be able to indirectly accomplish what it could not do directly, namely, force the state to pay a § 1983 judgment brought against a state official.

*See Kentucky v. Graham*, 473 U.S. 159, 166–70, 105 S.Ct. 3099, 3105–08, 87 L.Ed.2d 114 (1985) (overturning a § 1983 damages award against a state official acting in his official capacity in which the state was forced to pay the judgment). The *Will* Court also extended its analysis to governmental bodies that are arms of the state, as defined by the Eleventh Amendment, for the same reason. *Will*, 491 U.S. at 70, 109 S.Ct. at 2311–12. Therefore, a straightforward reading of *Will* indicates that in order to determine whether a governmental body is a "person" under § 1983, we must consider whether the body is an arm of the state for Eleventh Amendment purposes.

C. The Majority Misinterprets the *Will* and *Monell* Cases and Needlessly Complicates the § 1983 Analysis.

The majority opinion, however, finds a conflict between *Will* and *Monell* where none exists. It points to language in *Will* where the Court noted that the scope of § 1983 and the scope of the Eleventh Amendment are separate issues. Majority Opinion at 101, 898 P.2d at 1239. The majority opinion also points to the fact that *Will* did not overrule *Monell*'s holding that a local school board was a "person" under § 1983. The majority then attempts to "harmonize" *Will* and *Monell* by redefining the term "arm of the state" used in *Will* to mean an entity that is not "a local governing body with specific discretionary powers and duties." Majority Opinion at 101. Thus, the majority opinion concludes that *Monell* controls the present case, and holds that local boards are presumed to be "persons" under § 1983 as distinct from the question of whether they are arms of the state under the Eleventh Amendment.

However, the Court in *Will* noted that the holding in *Monell* was expressly limited to governing bodies that were not arms of the state for Eleventh Amendment purposes, and held that the rule established in *Will* applied to governmental entities that were arms of the state under the Eleventh Amendment. *Will*, 491 U.S. at 70, 109 S.Ct. at 2311–12.

Accordingly, the two cases do not conflict. Under *Monell,* governing bodies that are not arms of the state are "persons" under § 1983, and under *Will,* states, state actors sued in their official capacity, and arms of the state are not "persons" under § 1983. As for the language cited by the majority, the statements about the difference in scope of § 1983 and the Eleventh Amendment did not negate the fact that Eleventh Amendment considerations served as the primary basis for the Court's interpretation of the term "person." *Id.* at 66–67, 109 S.Ct. at 2309–10. In addition, this statement could just as easily be interpreted as an acknowledgement that § 1983 and the Eleventh Amendment have different applications; § 1983 applies in all forums, whereas the Eleventh Amendment only applies in federal courts, and Eleventh Amendment immunity may be waived by the states, whereas § 1983's immunity is definitional, and may not be waived.

The majority opinion also appears to suggest that not only is the examination of whether a local board is a "person" under § 1983 different from that conducted under the Eleventh Amendment, but that the § 1983 analysis will affect the board's immunity under the Eleventh Amendment. It notes that if the local board is not a "true 'arm of the state' " under the *Monell* § 1983 analysis, it "is not entitled to the state's Eleventh Amendment protections." Majority Opinion at 102, 898 P.2d at 1240. The majority then notes that *Martinez* failed to consider whether a local board was a "person" under § 1983 *before* examining whether it was immune from suit in federal court under the Eleventh Amendment.

This argument, however, stands the traditional approach to the Eleventh Amendment on its head. The Eleventh Amendment presents a jurisdictional question of whether the federal court is a proper forum to hear a claim against a particular defendant. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 907 n. 8, 79 L.Ed.2d 67 (1984). If the defendant is an arm of the state, the federal courts lack jurisdiction to hear the claim. Since the *Will* Court explicitly noted that Congress did not intend to revoke or alter a state's Eleventh Amendment immunity by enacting § 1983, *Will,* 491 U.S. at 66, 109 S.Ct. at 2309–10, there was no reason for the *Martinez* court to consider a school board's status under § 1983 in determining whether it was immune from suit in federal court. In suggesting otherwise, the majority substitutes its own unique interpretation of the interplay of the Eleventh Amendment and § 1983 which is contrary to the clear dictates of the Supreme Court.

**D. The *Howlett* Case Supports the Straightforward Approach to § 1983 Using an Eleventh Amendment Analysis.**

Fortunately, the U.S. Supreme Court removed any lingering doubt over the proper interpretation of the *Will* decision in *Howlett v. Rose,* 496 U.S. 356, 365, 110 S.Ct. 2430, 2436–37, 110 L.Ed.2d 332 (1990). In *Howlett,* the Court explicitly stated, "As we held last Term in [*Will*], an entity with Eleventh Amendment immunity is not a 'person' within the meaning of § 1983." The Court continued, "*Will* establishes that the State and *arms of the State,* which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court." *Id.* (emphasis added). Thus, the Supreme Court has made it abundantly clear that the term "person" does not include arms of the state and that the first step in determining whether a governmental entity may be sued under § 1983 is to examine whether it is an arm of the state under an Eleventh Amendment analysis, as set out in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977).

The majority suggests that the *Howlett* opinion implies that Eleventh Amendment immunity "does not apply to a political subdivision in a § 1983 action." Majority Opinion at 103, 898 P.2d at 1241. Thus, the majority seems to be arguing that § 1983 automatically revoked any Eleventh Amendment immu-

nity for "political subdivisions" regardless of their status as arms of the state as determined under *Mt. Healthy.*

However, the § 1983 claim in *Howlett* was initiated in state court and therefore did not raise any Eleventh Amendment issue, nor did the Supreme Court even address the Eleventh Amendment in *Howlett.* What the Supreme Court did do in *Howlett,* however, was expressly reaffirm its holding in *Will* which directly contradicts the majority's suggestion that the Eleventh Amendment does not always apply in § 1983 cases. In addition, the *Howlett* Court explicitly noted that the reason it was not addressing the question of whether the school board was an arm of the state for § 1983 purposes was because respondents did not raise that issue in its brief in opposition to the petition for certiorari. *Howlett,* 496 U.S. at 381 n. 24, 110 S.Ct. at 2445 n. 24. Therefore, the Court did not need to analyze whether or not the local school board fell within the class of governmental bodies found to be arms of the state under the Eleventh Amendment, and instead, simply assumed that the board was a "person" for § 1983 purposes because it had waived its immunity argument.

Unfortunately, the majority's interpretation of the *Monell, Will,* and *Howlett* opinions, addressing an issue which need not have been reached by this Court, sets us squarely at odds with the clear intent of the Supreme Court as well as the interpretation adopted by state courts that have considered the issue. *See, e.g., Town of Lake Clarke Shores v. Page,* 569 So.2d 1256, 1257 (Fla. 1990) (noting that *Will* requires a municipality not to be an arm of the state as defined by *Mt. Healthy* ); *Livingood v. Meece,* 477 N.W.2d 183, 190 (N.D.1991) ("It is now settled that neither a state, an entity with eleventh amendment immunity, nor a state official sued in his or her official capacity, is a 'person' within the meaning of § 1983 . . . ."); *Williams v. State,* 156 Vt. 42, 589 A.2d 840, 844 (1990) (noting that arms of the state with Eleventh Amendment immunity are not "persons" under § 1983); *Board of Trustees v. Landry,* 638 N.E.2d 1261, 1264 (Ind.Ct.

App.1994) (applying Eleventh Amendment analysis to determine immunity under § 1983); *National Camera, Inc. v. Sanchez,* 832 P.2d 960, 960 (Colo.Ct.App.1991) ("[S]tates and arms of the state, which have traditionally enjoyed Eleventh Amendment immunity, are not 'persons' within the meaning of § 1983."); *C.J. v. Vuinovich,* 252 N.J.Super. 122, 599 A.2d 548, 553 (Ct.App. Div.1991) (same idea). Accordingly, because the first prong of the majority opinion is unnecessary to our holding in this case and places us squarely against the U.S. Supreme Court's interpretation as well as that of our sister states, I strongly believe we should not have addressed the issue of the scope and interpretation of *Monell* and *Will.*

*II. The Majority Unnecessary Reexamines Local School Boards' "Arm of the State" Status.*

In the second prong of its § 1983 analysis (Part I.D.2) the majority reexamines whether New Mexico's local school boards are in fact arms of the state as defined by *Mt. Healthy.* This question, however, has already been addressed by the Tenth Circuit in *Martinez v. Board of Education,* 748 F.2d 1393, 1396 (10th Cir.1984), and answered in the affirmative. *See also Garcia v. Board of Educ.,* 777 F.2d 1403, 1407 (10th Cir.1985) (following *Martinez* ). The majority opinion criticizes *Martinez* for misapplying the *Mt. Healthy* factors and conducts its own analysis of the federal statute, reaching the opposite conclusion.

Once again, this question about the status of local school boards under the Eleventh Amendment need not have been addressed by this Court in reaching its conclusion. However, in conducting its own analysis, the majority unnecessarily places us in conflict with the Tenth Circuit and raises the possibility that a federal claim could successfully be brought in state court which would otherwise fail in federal court.

Furthermore, the recent opinion, *Ambus v. Granite Board of Education,* 995 F.2d 992, 994 (10th Cir.1993) (overruling prior opinion

holding Utah school board was an arm of the state), indicates that the Tenth Circuit may be rethinking its previous analysis of the *Mt. Healthy* factors. *Compare id. with Martinez*, 748 F.2d at 1396 *and Garcia*, 777 F.2d at 1411 (McKay, J., dissenting). Accordingly, until the question of the proper application of § 1983, a federal statute, is squarely before us, we should allow the Tenth Circuit to resolve the issues addressed by the majority.

### III. Conclusion.

As the majority correctly points out in the second part of its opinion, Daddow in fact received due process. The trial court found that the District offered Daddow a post-termination hearing, as well as opportunities to address the allegations prior to termination. These findings were not challenged on appeal. Since it is uncontroverted that there was no constitutional violation to serve as the basis for a § 1983 claim, we need not decide whether Daddow could have brought a § 1983 action against the school district had there been a constitutional violation.

Given the complexity of the issues involved, the limited briefing of those issues, and the potential conflicts created by the majority's approach, I believe this court should not have reached the issue of interpreting § 1983. This issue is best left for a future proceeding in which it must necessarily be decided and where the Court has the benefit of thorough briefing and argumentation. The fact that the majority failed to follow the straightforward approach set out by the U.S. Supreme Court in *Will* is indicative of the dangers in reaching issues not necessary for the opinion. Accordingly, I concur only in parts II, III, IV, and V, and in the affirmance of the trial court's decision.

BACA, C.J., concurs.

MINZNER, Justice (concurring in part and dissenting in part).

I concur in part and dissent in part. I join Part I of the majority opinion; I agree that

school boards and their members acting in their official capacities are "persons" for purposes of actions based on 42 U.S.C. § 1983 (1988), and that a New Mexico school district is not an arm of the State for purposes of § 1983. I also agree that the Carlsbad Municipal School District and the Carlsbad Municipal Board of Education ("the District") did not violate Catherine Daddow's federal constitutional right to due process. Thus, I join the majority's conclusion in Part II that the district court properly granted the District's motion for summary judgment on Daddow's § 1983 claim. I respectfully dissent, however, on the remaining issues, because I am not persuaded that NMSA 1978, Section 22–5–4 (Repl.Pamp.1993), permits a school board to discharge an employee without the prior recommendation of the superintendent. In my view, the District terminated Daddow contrary to Section 22–5–4, and thus the District breached the employment contract into which they had entered. In addition, I would hold that the district court erred in granting summary judgment in Daddow's favor on the District's counterclaim for negligence. Therefore, I would remand the case to the district court for trial on both Daddow's contract claim and the District's counterclaim. In light of these conclusions, I would vacate the award of costs. My reasoning follows:

### A. Whether Daddow's Discharge Complied with Section 22–5–4

I am unable to agree with Part III of the majority opinion, which affirms the district court's construction of Section 22–5–4(D). Under the district court's construction, the District properly discharged Daddow, notwithstanding the school superintendent's contrary recommendation. I respectfully suggest that the wording the legislature chose indicates it intended a different result. The legislature seems to me to have allocated the decision-making authority on this issue equally between the superintendent and the school board.

Section 22–5–4(D) states, in relevant part:

A local school board shall have the following powers or duties: ... (D) subject to

the provisions of law, approve or disapprove the ... termination or discharge of all employees ... upon a recommendation of ... termination or discharge by the superintendent of schools.... Any ... termination or discharge without the prior recommendation of the superintendent is void[.]

The majority opinion agrees with the District that the statute requires a superintendent's input, but does not render a school board powerless to act, except in accordance with the recommendation of its superintendent. Op. at 106, 898 P.2d at 1244. However, the statute authorizes a school board to "approve ... [the termination] upon a recommendation ... of termination ... by the superintendent" and then provides that a termination without the prior recommendation of the superintendent is void. I believe that the legislature intended the last sentence of the section to mean "[a]ny ... termination or discharge without the prior recommendation of [termination or discharge by] the superintendent is void." I note that Section 22–5–4(D) was amended in 1993 to say that "any employment relationship shall continue until final decision of the board." *See* 1993 N.M.Laws, ch. 226, § 12. Although the amendment is not applicable to the facts of this case, Daddow having been terminated prior to its effective date, it is consistent with the statutory construction I suggest is more appropriate: that the legislature contemplated the board would approve or disapprove a recommendation to terminate and did not authorize the board to discharge without such a recommendation.

There is some support for that construction in a 1980 opinion by Judge Andrews for the Court of Appeals. *See Gallegos v. Los Lunas Consol. Sch. Bd. of Educ.,* 95 N.M. 160, 162, 619 P.2d 836, 838 (Ct.App.) (discussing the 1979 amendment to Section 22–5–4(D), which added the last sentence of the statutory provision, and agreeing with board's position in that case, which was that the legislature intended to strengthen the superintendent's power), *cert. quashed,* 95 N.M. 299, 621 P.2d 516 (1980). Cases from

other states with statutes similar to ours also support the construction I suggest. *See Adkins v. Board of Educ. of Magoffin County,* 982 F.2d 952, 959 (1993) (under state law, school board "could not hire classified personnel without a recommendation from the Superintendent"); *State ex rel. Farley v. Board of Educ. of Euclid City Sch. Dist.,* 156 N.E.2d 924, 927–28 (Ohio 1958) (holding that "there can be no employment of a teacher ... without a recommendation by the superintendent to that effect made to the board"), *aff'd,* 169 Ohio St. 388, 159 N.E.2d 747 (1959); *Reed v. Greene,* 243 S.W.2d 892, 893 (Ky. 1951) (holding that the "recommendation of the superintendent is a condition precedent to the right of the board to employ").

I do not disagree with the reasoning of *Stanley v. Raton Board of Education,* 117 N.M. 717, 876 P.2d 232 (1994), which held that a school board may unilaterally discharge a superintendent without the superintendent's prior recommendation. As the *Stanley* opinion points out, it would be absurd to expect a superintendent to recommend his own removal. *Id.* at 719, 876 P.2d at 234. I am not persuaded, however, that requiring the superintendent's recommendation before a school board may discharge other employees serves no useful purpose. Rather, I believe the requirement provides additional protection for employees and strengthens a superintendent's administrative authority, reasonable choices we may presume the legislature made after due consideration of the alternatives. Thus, I would limit *Stanley* to those situations where the school board is attempting to discharge a superintendent.

### B. Daddow's Contract Claim

Following Daddow's presentation of her case, the district court directed a verdict in the District's favor after concluding that "[t]he School District did not breach its employment contract with Plaintiff by wrongfully terminating her." In my view, this was an erroneous conclusion of law.

By its terms, the employment contract between Daddow and the District incorporated

the termination procedures set forth in the Public School Code. The contract language mandates that any termination must comply with statutory procedures, even when there is good cause for termination.

> This contract may be canceled by the Board for cause, including unsatisfactory work performance, incompetency, insubordination, physical or mental inability to perform the required duties or for any other good and just cause, provided, that any such cancellation may be effected only in accordance with the New Mexico Statutes and any applicable rules and regulations of the State and Local Boards of Education.

This provision mandates that any termination must comport with the requirements of Section 22–5–4. Because the termination did not comport with that statute, the District improperly terminated her, and thus breached the foregoing provision of her contract. Whether Daddow was incompetent or insubordinate does not change the fact that the District failed to follow a procedure to which it had consented. I would reverse the directed verdict and remand for trial on the contract claim.

### C. Whether Daddow's Illegal Discharge Gives Rise to a § 1983 Claim

As set forth above, I believe that the District failed to comply with the requirements of Section 22–5–4(D). Notwithstanding that conclusion, I agree with Part II of the majority opinion that the district court properly granted summary judgment in favor of the District on the § 1983 claim. Even if the District's termination of Daddow without the prior recommendation of the superintendent did constitute an illegal deprivation of a valid property interest, Daddow is not entitled to relief under 42 U.S.C. § 1983.

In evaluating a procedural due process challenge to a deprivation of property, a court "examine[s] the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided

by statute or tort law." *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). When a governmental entity terminates a public employee, predeprivation procedural due process normally requires notice and an opportunity for a meaningful hearing. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). The record indicates that the District provided these safeguards to Daddow, and she does not challenge their adequacy on appeal. Moreover, under state law, Daddow had the right to challenge her termination in a postdeprivation common law contract suit, *see* NMSA 1978, § 37–1–23 (Repl.Pamp.1990), and she availed herself of that right.

Daddow's § 1983 claim does not challenge the adequacy of either the predeprivation safeguards or the postdeprivation state law remedies; rather, she asserts that because the District violated state law, it violated her constitutional rights. However, "[v]iolation of state law does not in itself create liability under Section 1983." *Garcia v. Las Vegas Medical Ctr.,* 112 N.M. 441, 443, 816 P.2d 510, 512 (Ct.App.), *cert. denied,* 112 N.M. 308, 815 P.2d 161 (1991).

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the United States Supreme Court indicated that procedural due process requirements may be satisfied by an adequate postdeprivation remedy; the Court held that random and unauthorized negligent conduct resulting in deprivation of property did not give rise to a § 1983 claim because an adequate state remedy existed. *Id.* at 541–43, 101 S.Ct. at 1916–17; *see also* 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation* § 3.09 (3d ed. 1991 & 1993 Cum. Supp.). In reaching its decision, the Court reasoned that the Fourteenth Amendment was not intended to be a " 'font of tort law to be superimposed upon whatever systems may already be administered by the States.' " *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917 (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96

S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976)). Underlying the *Parratt* decision were considerations of federalism and the concern that federal constitutional law would subsume all other forms of existing tort law. *See* Michael Wells & Thomas A. Eaton, *Substantive Due Process and the Scope of Constitutional Torts,* 18 Ga.L.Rev. 201, 208–212 (1984). *Parratt* and its progeny support a conclusion that Daddow's § 1983 claim lacks merit, regardless of whether the District violated Section 22–5–4 when it terminated her, absent a showing that state remedies or procedures are inadequate. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Costello v. Town of Fairfield,* 811 F.2d 782 (2d Cir. 1987). *See generally* 1 Nahmod, *supra,* § 3.17.

### D. The School Board's Counterclaim for Negligence

I also am not persuaded that the district court properly dismissed the District's counterclaim against Daddow for negligence, and I therefore respectfully dissent from Part V of the majority opinion. *See* 120 N.M. at 106–07, 898 P.2d at 1244–45. The district court determined that the School Board's negligence claim would not lie because there was no allegation that Daddow had personally profited from her malfeasance. The requirement of personal profit is not an element of a negligence claim. *See generally* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 30 (5th ed. 1984). Indeed, such a requirement would seem to be consistent with an intentional tort rather than one based upon negligence. Moreover, while Daddow defends the correctness of the dismissal, her brief to this Court cites no authority to support the proposition that, under these circumstances, a negligence claim requires a showing of personal profit.

I agree with the majority that the circumstances under which an employer can maintain a negligence action against an employee are limited. Nonetheless, I think that the facts of this case may give rise to such a claim. According to the Restatement of Agency,

The negligence for which an agent is subject to liability to the principal may consist of misconduct in negotiations with third persons, of conduct causing harm to the principal's tangible things in his custody, *or of conduct causing the principal to be subject to liability for a tort, crime, or breach of contract.* If the agent receives compensation, he is subject to liability in an action of contract or of tort. . . .

Restatement (Second) of Agency § 379, at 178 cmt. b (1958) (emphasis added). The School District's counterclaim specifically alleged that Daddow's negligence resulted in a $60,000 liability to the Department of Agriculture. Presumably, this liability arose out of the school district's breach of its contractual obligations.

*United States v. Gilman,* 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898 (1954), is distinguishable. In *Gilman,* a plaintiff who was injured as a result of Gilman's negligence brought a personal injury claim against the federal government pursuant to the federal Tort Claims Act. After the plaintiff recovered against the government, the government in turn brought a third-party claim against Gilman under a common law theory of indemnification, and the appeal ensued. *Id.* at 508, 74 S.Ct. at 695–96. Noting that Congress had been silent on the issue of indemnification, the United States Supreme Court weighed the public policy concerns and determined that a right of indemnification was not embodied in the federal Tort Claims Act. *Id.* at 509–13, 74 S.Ct. at 696–98.

Unlike Congress, however, our legislature has spoken on the issue of indemnification in the New Mexico Tort Claims Act, NMSA 1978, § 41–4–17(A) (Repl.Pamp.1989), which provides:

A. The Tort Claims Act [41–4–1 to 41–4–27 NMSA 1978] shall be the exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought

against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim. No rights of a governmental entity to contribution, indemnity or subrogation shall be impaired by this section, except a governmental entity or any insurer of a governmental entity shall have no right to contribution, indemnity or subrogation against a public employee unless the public employee has been found to have acted fraudulently or with actual intentional malice causing the bodily injury, wrongful death, property damage or violation of rights, privileges or immunities secured by the constitution and laws of the United States or laws of New Mexico resulting in the settlement or final judgment. Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto.

This statute makes available that which the *Gilman* Court lacked—legislative action suggesting general public policy. In view of the legislature's action, I am not satisfied that Daddow was entitled to judgment as a matter of law on the underlying facts. *See* SCRA 1986, 1–054(C) (Repl.Pamp.1992).

The district court dismissed the counterclaim after it granted the District a directed verdict on Daddow's contract claim. By then Daddow had put on her case-in-chief, but the District had not put on its defense or its case-in-chief on the counterclaim. Dismissal of the counterclaim under these circumstances probably constituted a grant of summary judgment in Daddow's favor. *Cf. Santistevan v. Centinel Bank of Taos*, 96 N.M. 734, 735, 634 P.2d 1286, 1287 (Ct.App.1980) (holding that a motion for dismissal for failure to state a claim may be treated as a motion for summary judgment if matters outside the pleadings are considered by the court), *aff'd in part, rev'd in part*, 96 N.M. 730, 634 P.2d 1282 (1981). In light of the procedural posture of this case at the time the District's counterclaim was dismissed, I am concerned that a decision to affirm is premature. We cannot determine on this record whether the District can support its allegations of negligence and, if so, what degree of negligence they would be able to prove. We also cannot determine on this record whether Daddow's negligence caused the District any harm. Indulging all reasonable inferences in favor of the District, I would conclude that summary judgment on the counterclaim was improper and remand for trial. Under these circumstances, I believe we run the risk of hampering the future development of the law governing an appropriate recovery of public funds in analogous cases, even if on these facts the ultimate resolution would be adverse to the District's position.

*E. Conclusion*

For these reasons, I would affirm the district court's decision granting the District summary judgment on Daddow's § 1983 claim, reverse the court's decision directing a verdict for the District on her contract claim and the decision dismissing the District's counterclaim, and remand for trial; I would vacate the award of costs to the District as premature. Although I agree with the analysis of the District's status under § 1983 and join Parts I and II of the majority decision, I respectfully dissent from those portions of the majority opinion affirming the district court's resolution of Daddow's contract claim and the District's counterclaim, and thus do not join Parts III, IV, and V of the majority opinion.